914 So.2d 788 (2005)
ANTWINE EQUALITY GRAVES, Appellant
v.
STATE of Mississippi, Appellee.
No. 2004-KA-00020-COA.
Court of Appeals of Mississippi.
November 8, 2005.
*790 Carmen N. Brooks, Jackson, Patricia F. Dunmore, Natchez, attorneys for appellant.
Office of the Attorney General by W. Daniel Hinchcliff, attorney for appellee.
EN BANC.
BRIDGES, J., for the Court.

PROCEDURAL HISTORY
¶ 1. On January 30, 2002, a jury sitting before the Harrison County Circuit Court found Antwine Equality Graves guilty of murder. With two prior felonies on his record, Graves qualified as a habitual offender. As such, the circuit court sentenced Graves to a life sentence without the possibility of parole. Graves filed an unsuccessful motion for new trial on February 8, 2002. Aggrieved, Graves appeals and raises the following issues:
I. THE COURT ERRED IN REFUSING TO GRANT A MISTRIAL FOLLOWING A JUROR'S IMPROPER COMMENTS
II. THE COURT ERRED IN NOT PERMITTING APPELLANT TO CROSS EXAMINE DARAY BLAND AND WILLIE FAIRLEY CONCERNING THEIR PROBATION STATUS AND FAVORABLE TREATMENT WHICH THEY RECEIVED IN EXCHANGE FOR THEIR TESTIMONY.
III. APPELLANT WAS DENIED A FUNDAMENTALLY FAIR TRIAL DUE TO THE TRIAL JUDGE'S MISCONDUCT DURING VOIR DIRE.
IV. GRAVES WAS DENIED A FAIR TRIAL DUE TO THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.
V. THE DEFENDANT WAS DENIED A FAIR TRIAL BY THE COURT'S DENIEL [SIC] OF HIS RIGHT TO CONFRONT WITNESSES AGAINST HIM.
VI. THE DEFENDANT WAS NOT ALLOWED TO USE PRIOR INCONSISTENT STATEMENTS TO IMPEACH WITNESSES.
Finding no error, we affirm.

FACTS
¶ 2. The record reveals the following set of events. On January 13, 2001, Graves went to the Blue Note Lounge in Biloxi, Mississippi. Daray and Marlon Bland also went to the Blue Note Lounge. The record does not reveal why, but Graves and *791 Marlon got into an argument. Certain testimony indicated that Graves shot a pistol into the air, though Graves denied that he fired that shot. Regardless, Blue Note employees told them to "take it outside." Graves left the Blue Note and went outside, followed by Marlon, Marlon's brother Daray, and Shawn Miami Johnson.
¶ 3. Graves and Marlon continued their argument. The record reveals disputed testimony, but the result is undisputed. Someone shot Marlon in his neck. As a result, Marlon died outside the Blue Note Lounge at approximately three o'clock a.m.
¶ 4. There were certain consistencies in the trial testimony. All witnesses agreed that Marlon and Graves argued. All witnesses agreed that Marlon and Graves were in close proximity. All witnesses agreed that Daray stood between Graves and Marlon. Otherwise, there are several discrepancies in the testimony.
¶ 5. Daray Bland, Marlon's brother, testified for the prosecution. Daray testified that, while they were still inside the Blue Note, he saw Graves shoot a chrome pistol into the air. Daray also testified that, when they were outside, Marlon pushed Graves because Graves had a pistol in his hand. Further, Daray testified that Graves caught his balance, then walked up to Marlon and shot him in the neck.
¶ 6. Willie Fairley also testified for the prosecution. Fairley testified that he followed Graves, Daray, and Marlon out of the Blue Note. Fairley, who testifed that he was approximately ten to fifteen feet away from the three men, said he could tell they were arguing but he did not know why. Though he did not see Marlon push Graves, Fairley saw Graves "make a step." According to Fairley, Graves then reached around Daray and shot Marlon in the neck. Fairley testified that he saw Graves holding a pistol. Next, Fairley heard Daray say to Graves, "you shot my brother."
¶ 7. Graves presented a "mistaken identity" defense. That is, Graves essentially argued that he was not the shooter. Though he testified in his own defense, he also presented witnesses who corroborated his version of events. While none of those witnesses corroborated Graves's testimony that Shawn "Miami" Johnson shot Marlon, certain witnesses presented testimony that suggested Graves could not have shot Marlon.
¶ 8. Rashad Goudy was one such witness. Goudy testified that he heard Daray say Graves shot Marlon. Goudy also heard Graves deny that he shot Marlon. Goudy saw Graves with his hands up in the air. Additionally, Goudy did not see a pistol in Graves's hands. Admittedly, there were approximately eighty people between him and the shooting. Goudy testified that he did not know who shot Marlon. Moreover, he did not know if Graves actually shot Marlon.
¶ 9. Miss Bullard ("Miss" is her first name) also testified for Graves. Bullard said she heard Graves say, "I didn't shoot your brother." Bullard never saw anyone with a weapon, but she did see Graves's empty hands in the air. Bullard admitted that she did not know who shot Marlon.
¶ 10. Lisa Allen testified for Graves and corroborated his defense theory. She saw Marlon push Graves. When Marlon pushed Graves, Graves lifted his hands in the air and stumbled back a couple of feet. Allen testified that she saw another man, presumably Shawn Johnson, move "over a little bit more in front of the guy (Marlon)." At that point, she heard a shot and saw Marlon fall. She elaborated that she did not see Graves shoot anybody, but she heard the gunshot and saw Graves at the same time. Graves was stumbling back to catch his balance. She never saw any *792 weapon in his hands, but she also never saw a pistol at all.
¶ 11. Kami Williams also testified for Graves. Williams testified that she heard Graves say that he did not shoot anyone. Further, Williams testified that, at the time of the shot, she thought Graves was falling.
¶ 12. Graves testified in his own defense. According to Graves, Marlon tried to punch Graves, but Marlon had to reach over Daray, so he missed. Graves also said that Daray pushed him back at the same exact time that Marlon tried to punch Graves. Graves explained that Johnson, one to two feet away from Marlon, swung at Marlon. Further, Graves testified that Johnson, having swung at Marlon, made contact and, at the point of contact, shot Marlon in the neck.
¶ 13. Thus, there are conflicting testimonies regarding the exact moment of the shot. Regardless, what happened afterwards is undisputed. Graves heard police sirens on the way to the Blue Note, so he got into his white Cadillac and left the scene before the police arrived. He drove to his grandmother's house, parked his car behind her house, and called a friend. That friend picked up Graves and drove Graves to his house, about two to three miles from his grandmother's house. According to Graves, he left the scene because "the incident had just occurred on Main Street ... and [he] didn't want to be involved in the incident...." Graves contacted his attorney around 5:30 or six a.m. and explained the events and that the police were at his grandmother's house. Because his attorney was going to be in the hospital for a week, Graves's attorney advised him to contact him in a week. Graves testified that he discovered that there was a warrant for his arrest, but he did not make that discovery until two or three days later. A week after his initial contact with his attorney, Graves contacted him again. On his attorney's advice, Graves turned himself in on January 22, 2001.

ANALYSIS

I. THE COURT ERRED IN REFUSING TO GRANT A MISTRIAL FOLLOWING A JUROR'S IMPROPER COMMENTS.
¶ 14. During voir dire, venire member Vicki Hancock said, "[m]y husband is a Biloxi police officer. I don't have any knowledge of this case, but he has mentioned the defendant on other occasions." After her comment, Graves's counsel requested to approach the bench. Graves's counsel requested a mistrial. The trial judge conducted an in camera hearing on the matter.
¶ 15. During the in-chambers conference, the trial judge found that Vicki's statement did not indicate any bad behavior or good behavior on Graves's part. Regardless, the trial judge offered to give a curative instruction, but Graves's attorney declined the trial judge's offer.
¶ 16. On appeal, Graves argues that Vicki's comment tainted the entire jury panel. Graves claims the trial judge erred when he overruled his motion for a mistrial. According to Graves, Vicki's comment led the jury to believe that Graves had a criminal past. Graves concedes that the jury did not know the exact nature of Graves's criminal past due to Vicki's comment. Still Graves argues that "it is enough that they were made aware that [Graves] had committed a criminal act that was notorious or noteworthy enough that a police officer came home and discussed it with his wife."
¶ 17. Though it is unclear how Graves came to this knowledge, Graves claims "[n]o one present in the courtroom thought *793 that Juror Hancock was referring to anything other than a criminal act." As for the fact that Vicki did not actually sit on the jury, Graves responds that "[i]t is of no consequence that Juror Hancock did not actually serve on the jury because everyone heard her improper comment."
¶ 18. A circuit court "may declare a mistrial if there occurs during the trial, either inside or outside the courtroom, misconduct by the party, the party's attorneys, or someone acting at the behest of the party or the party's attorneys, resulting in substantial and irreparable prejudice to the movant's case." URCCC 3.12. Additionally, "[u]pon motion of a party ... the court may declare a mistrial if ... [t]he trial court cannot proceed in conformity with law; or ... [i]t appears there is no reasonable probability of the jury's agreement upon a verdict." Id. Foremost, Ms. Hancock does not seem to fit the criteria of those people whose acts or comments may cause a mistrial, under URCCC 3.12.
¶ 19. Precedent also addresses a request for a mistrial. A trial judge may declare a mistrial only when the harm done would render the defendant without hope of receiving a fair trial. Reed v. State, 764 So.2d 511(¶ 7) (Miss.Ct.App.2000). When a "prejudicially incompetent matter or misconduct" occurs before a jury, and the trial judge cannot remove the effect by admonition or instruction, the trial judge should declare a mistrial. Davis v. State, 530 So.2d 694, 698 (Miss.1988). In a criminal case, when the defense objects to testimony, and the trial judge sustains that objection and instructs the jury to disregard the offending testimony, the trial judge's remedial acts are "usually ... sufficient to remove any prejudicial effect [of that testimony] from the minds of the jurors." Id. When a party fails to request such an instruction, that party is barred from raising that point on appeal. Carr v. State, 655 So.2d 824, 837 (Miss.1995) (citing Stringer v. State, 500 So.2d 928, 937 (Miss.1986)).
¶ 20. Graves's defense counsel unequivocally declined the trial judge's offer of a curative instruction. In this circumstance, there is no error requiring reversal. Buckley v. State, 511 So.2d 1354, 1357 (Miss.1987); Stewart v. State, 466 So.2d 906, 910 (Miss.1985); Clanton v. State, 279 So.2d 599, 602 (Miss.1973); Bridges v. State, 841 So.2d 1189(¶ 11) (Miss.Ct.App.2003).

II. THE COURT ERRED IN NOT PERMITTING APPELLANT TO CROSS-EXAMINE DARAY BLAND AND WILLIE FAIRLEY CONCERNING THEIR PROBATION STATUS AND FAVORABLE TREATMENT WHICH THEY RECEIVED IN EXCHANGE FOR THEIR TESTIMONY.
¶ 21. In this issue, Graves claims the circuit court erred when it refused to permit him to cross-examine two witnesses on the subject of favorable treatment or leniency they received in exchange for their testimony. Graves sought to question Daray Bland and Willie Fairley about any favorable treatment or leniency they received for testifying against Graves. The trial court let Graves proffer Bland and Fairley's testimony outside the jury's presence, but ultimately denied Graves's request. Graves claims the trial court's decision resulted in reversible error.

A. Daray Bland
¶ 22. When Daray testified, he was on probation. Counsel for Graves wanted to cross-examine Daray regarding Daray's probationary status and his underlying conviction. The circuit court stated that "evidence of a character conduct of a witness limits the inquiry into whether he has *794 opinion or reputation regarding his character for truthfulness or untruthfulness" under M.R.E. 608. Further, the circuit court stated that "impeachment of evidence of conviction of a crime shall be admitted if established by a public record or cross-examination if the crime was one punishable by death or imprisonment in excess of one year" under M.R.E. 609. The circuit court, citing Peterson v. State, 518 So.2d 632 (Miss.1987), noted that it must weigh the probative value of the evidence against the evidence's prejudicial effect. At that point, the circuit court instructed Graves's attorney, Mr. Albert Necaise, to proffer Daray's testimony out of the jury's presence.
¶ 23. During that proffer, Daray testified that he was on probation for aggravated assault and that he was on probation at the time of Marlon's death. Daray acknowledged that he violated his probation when he went to the Blue Note and that his probation officer had not filed a petition to revoke his probation. At that point, the following exchange between the trial judge and Graves's attorney occurred:
Mr. Necaise: Judge, I think that's probative to be able to show 
The Court: On what point, Mr. Necaise?
Mr. Necaise: It goes to his credibility, Judge. I mean, you can impeach somebody on a prior conviction. I think that I ought to have the right to let the jury know that he was on probation at the time.
The Court: The fact that he was on probation at the time what does that  on what material issue does that assist the jury?
Mr. Necaise: Well, it we could be that maybe  we could show that he was maybe given some leniency for not filing a petition because that's 
The Court: Why don't you inquire about that? There's no proof before me at this point that anyone even discussed that fact.
Mr. Necaise followed the trial judge's recommendation, resulting in the following:
Q. Did you advise [your probation officer] that you were in the Blue Note?
A. Yes, sir. He knows about my brother's death. He knows that I witnessed it.
Q. And did he say anything to you about being in the Blue Note?
A. No, sir.
Q. Okay. Were you suppose to be out at 3:00 in the morning?
A. No, sir.
Q. Okay.
Mr. Necaise: Judge, the reason  This is the same thing  My client was on probation at the time. If you look at the probation order it was  I think didn't say anything about being charged with murder. I think it was being in the Blue Note, a place that he had no right to be at the time. That's what he was originally revoked on.
The Court: Mr. Bland, did [your probation officer] or anyone else from the department of corrections say to you or indicate to you or do anything that even gave you the inference, even made you believe that if you don't come in here and testify for the district attorney's office, they were going to file some petition to revoke your probation? Anybody ever say that to you?
Daray: No, sir.
The Court: Anyone ever say or indicate they will leave you on probation if you do the right thing or you go testify for the state?
Daray: No, Sir.
The Court: All right.

*795 Mr. Necaise: Judge, it already shows that he's violated the terms of his probation arising out of the same incident out there, that nothing was done to him.
The Court: That may be, Mr. Necaise. But that's a function of the department of corrections, and there's no inference or testimony that he was given any leniency promise or reward or anything else in exchange for his testimony here today. Today it has to be probative and has to have some impeachment value to his testimony here today, and there's been none shown.
Mr. Necaise: Judge, that's what makes it an issue for the jury to determine that.
The Court: Not under Peterson v. State. It's an issue that I have to determine first whether the probative value outweighs the prejudicial effect. And the prejudicial effect is to say that he's just another person who was charged with a violent crime, an aggravated assault and was out there on probation where at 3:00 in the morning in a place like the Blue Note where folks are violating their probation and shooting one another. That is prejudicial to insinuate that even if it's true. I sustain the state's motion in limine. I'm not going to allow you  First of all, I need to make that on the record finding that the probative value of admitting the fact that he's on probation and was on probation at the time of the incident on the charge of aggravated assault does not outweigh the prejudicial effect, and that testimony to that effect would  does not assist the jury in any way. Nor is it impeachment as to the credibility of his testimony in the court's opinion. And under the guidelines of Peterson v. State [518 So.2d 632 (Miss.1987)] I find that the prejudicial effect does outweigh it. I will sustain the state's motion in limine. You may not go into the fact that he was convicted and on probation. You have your exception.

B. Willie Fairley
¶ 24. Willie Fairley testified for the State. At trial, counsel for Graves proffered Fairley regarding prior convictions and similar promises or offers of leniency. During that proffer, Fairley testified that, on March 10, 2001, he pled guilty to a charge of transfer of a controlled substance. Further, Fairley testified that, as a result of his guilty plea, he was placed on probation for three years. As with Daray, Graves sought to demonstrate that Fairley received favorable treatment in exchange for his testimony because Fairley's probation had not been revoked. The circuit court held:
Under 609(A)(1) and the balancing test under Peterson v. State ... there's no basis for [Fairley's] conviction or the sentence he received to allege that it was influenced or that he was given any leniency or reward or that he was threatened or coerced in any way by use of his probation and suspended sentence for his testimony or his presence here today. And thus the prejudicial value of introducing his conviction outweighs any probative value, and I therefore again sustain the state's motion in limine and will prohibit the defense from introducing his conviction and sentence.

C. Graves's Argument on Appeal
¶ 25. On appeal, Graves argues that the circuit court erred by excluding evidence that Daray and Fairley received leniency in exchange for their testimony. To be exact, Graves states, "Willie Fairley received *796 leniency with respect to unrelated charges that were pending at the time of the murder of Marlon Bland in exchange for his testimony." Graves omits Daray from this statement. Regardless, there is no evidence in the record that Fairley received leniency at all, and Graves does not cite to a specific portion of testimony in the transcript or record that indicates either witness received leniency. In fact, Fairley and Daray both denied they received leniency in exchange for their testimony.
¶ 26. Still, Graves cites Suan v. State, 511 So.2d 144, 147-48 (Miss.1987) and argues "[e]vidence that a material witness has received favorable treatment at the hands of law enforcement authorities; particularly where the witness himself is subject to prosecution is probative of the witness's bias and may be developed through cross-examination or otherwise presented to the jury." According to Graves, "[t]he trial court's denial of [Graves's] right to cross-examine the state's eyewitnesses deprived him of due process and the fundamental right to a fair trial."

D. Did the trial court err when it excluded the evidence at issue?
¶ 27. As mentioned, the circuit court based its decision on two separate authorities: Mississippi Rule of Evidence 609 and Peterson v. State, 518 So.2d 632 (Miss.1987). According to M.R.E. 609, "[f]or the purpose of attacking the credibility of a witness, evidence that a nonparty witness has been convicted of a crime shall be admitted subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted." M.R.E. 609(a)(1). Peterson is the first case in which the Mississippi Supreme Court applied M.R.E. 609. Peterson, 518 So.2d at 636.
¶ 28. In resolving whether the circuit court erred, we are mindful that a trial judge has "substantial leeway in controlling the admission of evidence." Moran v. State, 822 So.2d 1074, 1077(¶ 8) (Miss.Ct.App.2002). This Court will only reverse a trial judge's decision to exclude evidence if that decision results in harm. Ellis v. State, 856 So.2d 561, 565(¶ 9) (Miss.Ct.App.2003). "The relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused." Hentz v. State, 542 So.2d 914, 917 (Miss.1989). We may reverse a trial judge's decision to admit or exclude evidence if that decision results in prejudice or harm. Ellis, 856 So.2d at 565(¶ 9).
¶ 29. As for Graves's reliance on Suan, we find that it is inapplicable to this case. To be sure, "[e]vidence that a material witness has received favorable treatment at the hands of law enforcement authorities; particularly where the witness himself is subject to prosecution is probative of the witness's bias and may be developed through cross-examination or otherwise presented to the jury." Suan v. State, 511 So.2d at 147-48. However, the rule in Suan has not applied to every circumstance. In Craft v. State, 656 So.2d 1156 (Miss.1995), the Mississippi Supreme Court distinguished Suan when it held that, where there is no evidence that indicates or even implies that a witness testified favorably in exchange for favorable treatment, Suan is inapplicable. Id. at 1163. Here, there is no evidence that Daray or Fairley testified favorably in exchange for favorable treatment. Instead, Daray and Fairley both denied that they received any leniency in exchange for favorable testimony. Accordingly, Suan is inapplicable. Id.
*797 ¶ 30. As for the trial judge's application of M.R.E 609, we cannot say that the trial judge abused his discretion. The trial judge weighed the prejudicial effect of the testimony against its probative value. Considering that Fairley and Daray both denied they received leniency for favorable treatment, the trial judge did not abuse his discretion in determining that the prejudicial effect of testimony regarding Daray and Fairley's probationary status outweighed any probative value of that evidence. We affirm the trial judge's decision.

III. APPELLANT WAS DENIED A FUNDAMENTALLY FAIR TRIAL DUE TO THE TRIAL JUDGE'S MISCONDUCT DURING VOIR DIRE.
¶ 31. In this issue, Graves states "[t]he trial judge committed reversible error when it stated to the jury that he had presided over the marriage ceremony of Assistant District Attorney Mark Ward during voir dire." Mr. Ward was one of the two assistant district attorneys who prosecuted Graves. Graves suggests that the trial judge's comment was improper because it bolstered Mr. Ward's position before the jury. According to Graves, the trial judge's comment, and its bolstering effect, undermined Graves's right to a fundamentally fair trial. We think counsel for Graves misreads the record. This is evident from the exchange at issue:
The Court: All right. Ms. Harper, whom do you know?
Juror Harper: Mr. [Scott] Lusk's mother and I work together.
The Court: You currently work together?
Juror Harper: We do. We share an office.
The Court: And do you know Mr. Lusk?
Juror Harper: I do.
The Court: And how long do you think you've known him?
Juror Harper: Probably most of his life.
The Court: Okay. How often do you think you have an occasion to see him or visit with him?
Juror Harper: Very infrequently.
The Court: I know you weren't  He was recently married. I know you weren't there because I presided over it, but is there anything, Ms. Harper, about that relationship, the fact that you've known Mr. Lusk all these years you think would automatically cause you to either lean in his favor or maybe because you've known him all these years you'd automatically lean the other way? I'm not going to ask you. I think you get the gist of my question. Would the fact that you know Mr. Lusk, would that cause you to be unfair to either side, the defendant or the state in this case?
Juror Harper: I don't think so.
The Court: Thank you, ma'am.
¶ 32. So, Graves actually means Mr. Lusk when he claims the trial judge's comment bolstered Mr. Ward. Mr. Lusk is also an assistant district attorney. Mr. Lusk and Mr. Ward both prosecuted Graves. Thus, there is no substantial difference in Graves's claim, simply because he mistakenly references Mr. Ward instead of Mr. Lusk.
¶ 33. Regardless, Graves did not make a contemporaneous objection. This issue is procedurally barred as it was not properly raised in the trial court. A trial judge cannot err when he has not had an opportunity to make a decision. Milano v. State, 790 So.2d 179(¶ 47) (Miss.2001). The Mississippi Court of Appeals has no original jurisdiction; it can only try questions that have been tried and passed upon in the trial court. Id. For this reason, this *798 issue is not properly before this Court. Id.
¶ 34. Moreover, Graves failed to cite any authority for this issue. An appellant is obligated to provide authority to support his argument. Williams v. State, 708 So.2d 1358(¶ 12) (Miss.1998). When an appellant fails to cite authority for an argument, a procedural bar operates, and this Court is not obligated to consider that argument. White v. State, 818 So.2d 369(¶ 7) (Miss.Ct.App.2002). As such, this issue is doubly barred.

IV. GRAVES WAS DENIED A FAIR TRIAL DUE TO THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.
¶ 35. In this issue, Graves claims he received ineffective assistance of counsel because his attorney failed to impeach Fairley's testimony with a prior inconsistent statement. When a party raises an ineffective assistance of counsel claim on direct appeal, the proper resolution is to deny relief without prejudice to the defendant's right to assert the same claim in a post-conviction relief proceeding. Pittman v. State, 836 So.2d 779(¶ 38) (Miss.Ct.App.2002). "We should reach the merits on an ineffective assistance of counsel issue on direct appeal only if `(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.'" Id. at (¶ 39) (quoting Colenburg v. State, 735 So.2d 1099, 1101 (Miss.Ct.App.1999)). If we do not consider the issue due to the state of the record, assuming we affirm the conviction, Graves may raise his ineffective assistance of counsel claim in post-conviction relief proceeding. Id. The parties have not entered any such stipulation, and the record does not affirmatively show ineffectiveness of constitutional dimensions. Accordingly, Graves may raise his ineffective assistance of counsel claim in a post-conviction relief proceeding.

V. THE DEFENDANT WAS DENIED A FAIR TRIAL BY THE COURT'S DENIEL [SIC] OF HIS RIGHT TO CONFRONT WITNESSES AGAINST HIM.
¶ 36. In this issue, Graves repeats his claim from issue two, above. That is, Graves claims that the trial court erred when it did not allow him to cross-examine Daray or Fairley regarding their prior felony convictions. As we resolved that question in issue two, there is no reason to repeat our analysis. This issue is meritless.

VI. THE DEFENDANT WAS NOT ALLOWED TO USE PRIOR INCONSISTENT STATEMENTS TO IMPEACH WITNESSES.
¶ 37. In this issue, Graves reiterates a point he raised in his ineffective assistance of counsel claim from issue three. Here, Graves claims the circuit court erred when it refused to allow Graves to impeach Fairley with a prior inconsistent statement.
¶ 38. Graves's defense theory was that Shawn "Miami" Johnson shot and killed Marlon Bland. Willie Fairley initially gave a statement indicating he heard Johnson say "somebody's going to die." However, on cross-examination, Fairley denied he actually heard Johnson make that statement. The trial judge admonished Graves's counsel from reading from Fairley's statement and advised him that the proper impeachment method was to call the police officer present when Fairley gave the statement. That police officer had been deployed to Bosnia at the time, so the trial judge told Graves that he could *799 introduce the statement through the investigator in charge of the case. During cross-examination of that investigator, counsel for Graves did not raise the issue of Fairley's prior statement. According to Graves, it "was absolutely critical for [Graves's] defense that Fairley's testimony at trial be impeached by his statement to police."
¶ 39. Even though Graves's counsel did not introduce Fairley's statement into evidence, Graves's counsel did cross-examine Fairley on the matter. The following exchange transpired:
Q. [L]et me start over. (reading from the statement) I remember [Johnson] saying there ain't going to be no, I don't know some shit or inaudible, somebody if there's going to be anything, somebody's going to get killed some shit. I can't remember how it went, but it was something like that in that nature.... [d]id you say that in your statement?
A. Yes, I did say that.
Q. Well, you did hear [Johnson] say something?
A. No. What I should have said in my statement was that I didn't hear that come out of [Johnson's] mouth, but I had heard on the street that's what was said.
Q. Now, Mr. Fairley 
A. Yes.
Q.  that's not what you say in this statement, is it?
A. No, it's not.
Q. Now, is this statement true?
A. Yes, my statement's true.
Q. When then you said, I remember [Johnson] saying. That is true, isn't it?
A. Well, maybe I didn't word it right when I said that.
Q. Okay. Okay. So you didn't hear [Johnson] say that, but you said that in your statement?
A. Like I said, maybe I didn't word it right when I said it.
Q. You just didn't word it right. All right.
A. I not fixing to sit up here and lie on [Johnson]. I'm not fixing to sit up here and lie on [Graves].
¶ 40. Thus, Graves's counsel brought Fairley's inconsistent statement to light. The jury heard Fairley say that he heard Johnson say something that implicated Johnson, rather than Graves, as Marlon's killer. The jury also heard Fairley explain his statement as a mistake. Fairley explained that he did not actually hear Johnson say anything, but he heard someone say that Johnson said "someone's going to die" or something similar. Accordingly, that evidence that Graves claims his counsel did not introduce, is clearly in the record and was adequately before the jury through Fairley's testimony.
¶ 41. Not only is Graves patently wrong, as the circuit court allowed Graves to cross-examine Fairley with Fairley's prior statement, Graves actually did impeach Fairley on that statement. Further, the circuit court also allowed Fairley to introduce the statement through the investigator in charge of the case because the officer that took the statement had been deployed to Bosnia. This issue is completely meritless.
¶ 42. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN PRISON WITHOUT PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS *800 APPEAL ARE ASSESSED TO APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.