# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00472-COA

**STEVEN L. LEWIS A/K/A STEVEN LEWIS**                      APPELLANT

**v.**

**STATE OF MISSISSIPPI**                                                APPELLEE

DATE OF JUDGMENT:               04/06/2021
TRIAL JUDGE:                          HON. TONI DEMETRESSE TERRETT
COURT FROM WHICH APPEALED:   SHARKEY COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                                      BY: MOLLIE MARIE McMILLIN
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                                      BY: ALLISON ELIZABETH HORNE
DISTRICT ATTORNEY:            RICHARD EARL SMITH JR.
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                  AFFIRMED - 04/25/2023
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McCARTY AND EMFINGER, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     Steven Lewis was accused of killing a father and son after a minor dispute. Following a jury trial, he was convicted of both first-degree and second-degree murder. He was sentenced to consecutive terms of life imprisonment and forty years to serve. Finding no error, we affirm.

## FACTS

¶2.     In 2017, Stephen Lewis shot and killed Alex Jennings Sr. and Alex Jennings Jr. Around the Delta town where the three lived, Rolling Fork, Alex Sr. was known as Ace, while his son was called Mookey.

¶3.    No one disputes Lewis killed Ace and Mookey; Lewis always admitted that he shot and killed the father-son duo. The core question at trial was whether the killings were done deliberately or in self-defense.

¶4.    Three people witnessed the shootings and what happened afterward. One witness was Candace Macon, who was at the intersection of Highway 61 and Highway 16. Across the road from her, she saw a fistfight—Lewis was fighting Mookey, and Lewis' brother and Lewis' friend were fighting Ace. She said, "I just saw both - - all of them fighting each other." But then she noticed the events take a turn for the worse when she witnessed Lewis and Mookey fall to the ground together. Afterward, "[she] heard a gunshot."

¶5.    After she heard the gunshot, "[Mookey] didn't move." And that's when Lewis got up from the ground. Then, "[h]im and [Ace] got to fighting." Shockingly, she recalled the two men "fighting and I remember just seeing [Lewis] standing over [Ace] with a gun," and then she "heard a few shots." She testified that Lewis had the gun and was pointing it at Ace. After Lewis shot Ace, Lewis seemingly "walk[ed] off" to his trailer.

¶6.    But when he was walking back to his trailer, Lewis appeared to squat down, and then dropped to his knees. Then Macon heard another gunshot. At that point, she drove away from the crime scene and called 911.

¶7.    Another witness was Henry Denis. According to his testimony, when he was turning at the intersection, he "saw two objects laying in the road." Specifically, he "looked up and there was one body laying up above. There was another body laying in the road."

¶8.    But Denis testified one of the "objects" was pulling himself across the road using his

2

arms. Denis saw it was the elder Jennings, Ace. After he saw Ace pulling himself across the road, he "saw another man walk up behind him and shoot him three times . . . [in] his back." The man simply "walked up to him and shot him in his back."

¶9. Denis called the police and identified Lewis as the person who shot Ace.

¶10. The third witness was Drake McKnight, who was Lewis' best friend. He explained Lewis was with him at his mother's house. McKnight testified that Ace and Mookey pulled up and demanded a toolbox. Lewis agreed to give Ace his toolbox back when he got back to his house. After the exchange, Ace and Mookey left.

¶11. Then Lewis and McKnight went to Lewis' house. About five minutes later, Ace and Mookey showed up for the toolbox. According to McKnight, everything was fine at first. But then McKnight heard Lewis and Mookey "exchanging words with each other." McKnight said he was in the car while the pair were arguing, and he looked in the rear-view mirror and noticed Lewis and Mookey "scuffling or something"—the two men had begun fighting and "throwing punches." McKnight attempted to break up the fight between them. Ace was trying to break up the fight as well.

¶12. At some point during the fighting, McKnight heard a gunshot and then saw Mookey was on the ground. He said Lewis "had a gun" and was walking toward Ace. McKnight began to run off to avoid the violence. After he started running, remembered he "heard two single shots." McKnight called the police and told them his friend had just shot Ace and Mookey.

## PROCEDURAL HISTORY

3

¶13.    Steven Lewis was charged with two counts of murder and one count of possession of a weapon by a felon.  Lewis' indictment was later amended to reflect his habitual offender status.  The State filed a second motion to amend Lewis' indictment to include a firearm sentencing enhancement, which the trial court subsequently granted.

¶14.    Lewis' counsel later moved to withdraw, which the trial court granted.  Lewis also moved to quash and dismiss his indictment and to disqualify the Ninth Judicial District Attorney due to an alleged conflict of interest.  The trial court denied Lewis' motion to quash and dismiss his indictment but granted his motion to disqualify the district attorney's office.[1]

¶15.    While incarcerated, Lewis filed a pro se motion to change venue.  He argued he could not get a fair trial in Sharkey County because his case "ha[d] been widely publicized" in the community.  The trial court did not reach the merits of his motion and denied it because it "was not supported by the affidavits of two or more credible persons" as required by the venue statute.

¶16.    Yet on the first day of trial, Lewis' concerns proved valid.  There were so many prospective jurors who knew about the case or had views on it that twelve jurors could not be selected.

¶17.    After granting a mistrial, the trial court discussed the next steps with the attorneys. The State indicated it would file a motion to change venue unless the defendant resumed his request.

The State:          Your Honor, I just as soon as possible try to get a motion

---

[1] As a result, the Office of the Mississippi Attorney General subsequently appointed a special prosecutor for the case.

|            | of venue or if the defendant is going to go forward with that, try to get that done as quick as possible. |
| The Defense: | Your Honor, the defendants are already - - the defense, while he's a pro se attorney, I already filed - - well, while he's representing himself pro se, I already filed a motion of venue that I imagine that we will - - redo another motion for venue with a - - |
| . . . |  |
| The Court: | How soon do you think you will have that filed? |
| The Defense: | I'll get it filed before the week is out. |

¶18.    Despite these assertions by counsel, the defense did not re-file the request to change venue.

¶19.    Nonetheless, the trial court subsequently entered an order granting a change of venue "due to the size of the community and the great number of jurors who were personally familiar with either the defendant or the victims in this matter narrowed the jury pool so significantly as to result in a mistrial."  The trial court determined "*sua sponte . . .* that a change of venue is proper" and transferred the trial to Warren County.

¶20.    During trial, Lewis took the stand in his own defense.  He said that the origin of the fight was because Ace owed him money for drugs.  He testified that two or three weeks before the murders, he found Ace's toolbox at a local hangout, and he took it home with him. Lewis testified that Ace confronted him the day after he took the toolbox, but Lewis told him that "you owed me money anyway, so me and you should be even."  According to him, Ace "laughed it off."

¶21.    When Ace and Mookey confronted him later, Lewis testified he was "in a good mood"

5

and that he told Ace he would give him his tools back once he got back to his house. "He had already been owing me money," Lewis said, and told the jury Ace promised " I can either give you 50 or you wait till tomorrow I'll give you a hundred[.]"

¶22.   Lewis told Ace he could "gone head up there and get the toolbox." And at that point "[e]verything - - it was normal." He even told Ace a second time to "go get the toolbox off the porch."

¶23.   In Lewis' version of events, Mookey got out of the car, "angry for some reason," and Lewis asked him "why you looking like that?" Mookey replied, "Sh*t, man, I'm straight. . . I'm going to make sure me and my dad is straight." At some point during the conversation between Lewis and Mookey, Lewis told Mookey to leave because "he was showing . . . like he had a problem that morning." Lewis went on, "I told Mookey I'll bring [Ace] where you want me to bring him to, but he had to leave because he just was too aggressive." Ace was telling Mookey to get back into the car, but Lewis and Mookey continued to argue.

¶24.   Lewis testified that Mookey threw the first punch. During the argument, Lewis said that Mookey pulled a gun "[o]ut of his jacket" and that he "just grabbed it." He continued, "[W]hen he reached for it, everything just changed. It's like it was different. All I could think was just get the gun." And "[w]hen I went for the gun, it like -- the gun fired. And when the gun fired while I was coming to him, it's like I grabbed the gun and both of us, like, fell." But he noted that "the gun fell more my way. It fell on the ground more my way. So I grabbed the gun."

¶25.   When he picked it up, he "[s]hot the gun" more than one time. That's when he shot

6

Mookey. After he shot Mookey, he turned around and saw that Ace was close by. He said, "[Ace] tried to rush me" and "I started shooting," and he shot Ace.

¶26. But on cross, Lewis admitted he shot Ace in the back of the head because he thought Ace had put his hand in his jacket as if he were reaching for something. Lewis said, "I just was shooting." Lewis said he was also shot, claiming a wound to his leg.

¶27. The jury found Lewis guilty of first-degree murder for the killing of the father and guilty of second-degree murder for the killing of the son, but the jury acquitted him of possession of a firearm by a felon. The court sentenced Lewis as a habitual offender to life imprisonment for first-degree murder and a consecutive term of forty years to serve in custody for second-degree murder, without eligibility for parole.

## DISCUSSION

¶28. Appointed counsel for Lewis raises five claims of error allegedly warranting reversal on appeal, which were further explored during oral argument presented at Mississippi State University. Acting pro se, Lewis filed his own brief raising five issues. We will address each in turn.

### *Issues Raised by Defense Counsel*

**I.     The transfer of venue to Warren County was not error.**

¶29. Lewis' first argument on appeal is that the trial court erred in transferring his case to Warren County. Even though Lewis filed the request for a change of venue, his appointed counsel now argues it was improper to transfer the trial to a neighboring county.

¶30. We begin at our foundation: in Mississippi "the accused shall have a right to . . . a

speedy and public trial by an impartial jury of the county where the offense was committed[.]" Miss. Const. art. 3, § 26 (1890).

¶31. But there are reasons defendants may not want to be tried in that county, despite their right to it. For instance, a defendant may feel that he or she cannot receive a fair trial there, whether due to publicity or for some other reason. The Supreme Court has acknowledged that "[a] venire drawn from a fair cross-section of the community in theory and in fact is supposed to, and generally will, represent that community—and reflect the biases and prejudices of that community—as every judge and lawyer who has ever picked a jury well knows." *Fisher v. State*, 481 So. 2d 203, 215 (Miss. 1985), *overruled on other grounds by Nevels v. State*, 325 So. 3d 627 (Miss. 2021).

¶32. So "[c]hanging venue is one of the means our law affords accuseds for vindication of th[e] right" to a fair trial. *Id*. at 216. State law sets out a procedure through which a defendant requests a change of venue:

> On satisfactory showing, in writing, sworn to by the prisoner, made to the court, or to the judge thereof in vacation, supported by the affidavits of two or more credible persons, that, by reason of prejudgment of the case, or grudge or ill will to the defendant in the public mind, he cannot have a fair and impartial trial in the county where the offense is charged to have been committed, the circuit court, or the judge thereof in vacation, may change the venue in any criminal case to a convenient county, upon such terms, as to the costs in the case, as may be proper.

Miss. Code. Ann. § 99-15-35 (Rev. 2020). "An application for a change of venue must conform strictly to this statute." *Smith v. State*, 981 So. 2d 1025, 1033 (¶39) (Miss. Ct. App. 2008) (finding a motion was properly denied when it "was not made in writing, sworn to by the prisoner, or supported by affidavits from at least two credible persons").

8

¶33. Here, without the benefit of counsel, Smith filed his own motion for a change of venue. In handwriting, he detailed that he was arrested at his residence "[i]n front of a massive crowd of people," which also later appeared at the hospital where the two victims were taken.

¶34. In one case, we held that the trial court had properly denied a motion to change venue sought by a defendant. *Barnes v. State*, 854 So. 2d 1, 5 (¶11) (Miss. Ct. App. 2003). We noted first that the trial court had told the parties that "if during voir dire it determined that a fair and impartial jury could not be selected, it would order a change of venue sua sponte." *Id*. "During voir dire, the court struck several potential jurors who indicated that they either knew a great deal about the case, or knew the victim personally, or felt they might not be impartial." *Id*. Then "[t]he court also accepted several challenges for cause, as well as the full number of peremptory challenges." *Id*.

¶35. We concluded that "the court below acted scrupulously to protect [the defendant's] right to a fair trial." *Id*. at (¶12). Since "[t]he trial court conducted its inquiry into the appropriateness of changing venue diligently, and on the record reserved its right to change venue sua sponte if necessary," we determined "[t]here is no error here." *Id*.

¶36. While in *Barnes* we upheld the denial of a motion to change venue, the same processes are why we conclude the motion was properly granted in this case. The trial court in this case was presented with actual proof that a jury could not be impaneled after a mistrial was declared; furthermore, the defendant had already asked for a venue change, claiming he would never get a fair trial in his home county because too many people knew about the

9

allegations for which he was on trial. The trial court in this case, as in *Barnes*, proceeded with caution and "acted scrupulously to protect [Lewis'] right to a fair trial." *Id.* at (¶12). We will not find error when it is clear that the trial court diligently safeguarded the rights of the accused.

¶37. Furthermore, to the extent Lewis got exactly what he requested, we will not allow him to assign error on this point. "A defendant cannot complain on appeal of alleged errors invited or induced by himself." *Thomas v. State*, 249 So. 3d 331, 347 (¶55) (Miss. 2018) (quoting *Galloway v. State*, 122 So. 3d 614, 645 (¶87) (Miss. 2013)). The Supreme Court has explained that the purpose of the invited-error rule is to "bind trial counsel to strategic decisions inducing judicial rulings with the purpose of obtaining favorable judgments for their client" and "also defeats the disreputable strategy aimed at requesting a judge act in a particular way to salt the record with error as an end in itself, thereby providing potential grounds for reversal of an adverse judgment." *Id.* at (¶56).

¶38. Lewis' pro se motion to change venue was denied because it did not contain the correct supporting documentation, but that does not change that he did indeed make the request to change venue. During oral argument, his appointed counsel argued that Lewis did not necessarily understand the implications of his actions; however, because he sought the venue change, and it was granted after he was proved correct, we will not reverse on this point.

## II. The jury instructions were properly denied.

¶39. Lewis asserts that the trial court erred in denying his Castle Doctrine and stand-your-

ground jury instructions, as they related to his theory of the case that he acted in self-defense.

¶40.    "The standard of review with regard to a trial court's decision to grant or deny a jury instruction is abuse of discretion." *Thompson v. State*, 338 So. 3d 730, 738 (¶42) (Miss. Ct. App. 2022) (internal quotation marks omitted).  "In its analysis, an appellate court considers all given jury instructions to determine whether, when read as a whole, they fairly announce the law of the case and create no injustice[.]" *Id*. (internal quotation marks omitted).  "If the instructions fairly state the law and do not prejudice the defendant, reversal is not warranted." *Id*. (internal quotation marks omitted).  "In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." *Id*. (internal quotation marks omitted).

¶41.    Additionally, the Supreme Court has explained that "[a] defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Newell v. State*, 49 So. 3d 66, 74 (¶20) (Miss. 2010).  And "[w]hen serious doubt exists as to whether an instruction should be included, the doubt should be resolved in favor of the accused." *Id*.

¶42.    Finally, "[i]n homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Pulliam v. State*, 321 So. 3d 1185, 1193-94 (¶27) (Miss. Ct. App. 2020).  And "[a] party only has a right to have those [jury] instructions granted that are supported by sufficient credible evidence."  2 Jeffrey Jackson, Donald E. Campbell &

11

Justin L. Matheny, *Mississippi Civil Procedure* § 20:7, at 50 (2018) (citing *Adkins v. Sanders*, 871 So. 2d 732 (Miss. 2004)). Critically, "a defendant is entitled to have every legal defense he asserts be submitted as a factual issue for determination by the jury under proper instruction of the court." *McNeer v. State*, 307 So. 3d 508, 514 (¶14) (Miss. Ct. App. 2020). "In essence, the jurisprudence of this State demands that a theory of defense must be adequately instructed if the evidence warrants." *Id*.

### A. Castle Doctrine

¶43. Lewis sought but was refused an instruction that would have bolstered his theory of self-defense. Lewis' proposed jury instruction D-4[2] read in pertinent part as follows:

> Steven Lewis is presumed to have reasonably feared death, great bodily harm, or a serious crime being committed against him if Alex Jennings Sr. was unlawfully and forcibly entering; or had unlawfully and forcibly entered Steven Lewis' dwelling, or the immediate area of a dwelling. This presumption does not apply if Alex Jennings Sr. had a right to be in the dwelling or the immediate area of a dwelling or if Steven Lewis was committing a criminal act.

¶44. This instruction was based upon our Castle Doctrine, codified as Mississippi Code Annotated. § 97-3-15(3) (Supp. 2016):

> A person who uses defensive force shall be presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him or another or upon his dwelling . . . if the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered, a dwelling . . . or if that person had unlawfully removed or was attempting to unlawfully remove another against the other person's will from that dwelling . . . and the person who used defensive force knew or had reason to believe that the forcible entry or unlawful and forcible act was occurring or had occurred.

---

[2] Lewis requested a parallel instruction regarding Alex Jennings Jr. (Mookey).

¶45.    Put differently, as caselaw has previously summarized, the Castle Doctrine "creates a presumption of fear and abridges a duty to retreat in certain prescribed circumstances." *Newell v. State*, 49 So. 3d 66, 74 (¶22) (Miss. 2010). The Castle Doctrine "curtailed the duty to retreat and created a presumption that the defendant reasonably feared imminent death, great bodily harm, or the commission of a felony upon him from a person who has unlawfully and forcibly entered the immediate premises of a dwelling . . . ." *Pulliam v. State*, 321 So. 3d 1185, 1194 (¶29) (Miss. Ct. App. 2020) (internal quotation marks omitted).

¶46.    In one case, we upheld a finding that the Castle Doctrine was inapplicable when the evidence did not support it. *Howell v. State*, 144 So. 3d 211, 218 (¶20) (Miss. Ct. App. 2014). In that case, the defendant was at his house when one Jones arrived. *Id*. at 214 (¶3). Jones got out of the car and met with Howell in his garage. *Id*. Testimony revealed that Howell had sold a car to Jones, and Jones still owed Howell money for it. *Id*. The plan was for Jones to pay the rest of the money he owed to Howell for the car and get a set of car keys from him. *Id*. But at some point after Jones got to Howell's house, the conversation between the two men became "heated and confrontational." *Id*.

¶47.    Apparently Jones started to curse and yell at Howell, "could not remain still, and was acting paranoid and out of control." *Id*. at (¶4). Howell alleged that Jones tried to grab a baseball bat, and in response, Howell took out a gun and shot and killed Jones. *Id*. An autopsy would later reveal that Howell shot the unarmed man five times; the jury was not instructed on his theory of the Castle Doctrine. *Id*. at 218 (¶20).

¶48.    Howell appealed and argued the "Castle Doctrine exonerate[d] his conduct." *Id*. at

13

216 (¶14). We emphasized the statutory language of the Castle Doctrine, noting that the doctrine first "requires an unlawful and forcible entry or trespass before the presumption arises that allows the use of deadly defensive force." *Id*. at 217 (¶18). We found the Castle Doctrine to be inapplicable given the evidence developed at trial. *Id*. In particular, "the evidence fail[ed] to show that Jones unlawfully and forcibly entered Howell's home[.]" *Id*. Rather, Howell invited Jones to his house to pay the remaining money he owed to Howell. *Id*. at 218 (¶19).

¶49.    In a recent case from our Court, a defendant had allowed the victim to live with her for over a year. *Byrd v. State*, 294 So. 3d 86, 88 (¶3) (Miss. Ct. App. 2019). The two had a dispute, and the defendant shot and killed the victim. *Id*. at 88-89 (¶¶1-4). On appeal, the defendant complained her counsel was ineffective for not requesting a Castle Doctrine jury instruction. *Id*. at 94 (¶31). In response, the State argued the defendant could not be entitled to the instruction because the victim "was not in the process of unlawfully and forcibly entering the dwelling." *Id*. at 96 (¶33).

¶50.    We agreed, finding that "although [the defendant] owned the home, she had allowed [the victim] to live with her for over a year." *Id*. at (¶34). As a result, "[i]t was his residence as much as hers." *Id*. The fact that he did not immediately leave her house when she allegedly asked him to "[did] not constitute an unlawful entry." *Id*.; *see also Reid v. State*, 301 So. 3d 650, 664 (¶61) (Miss. Ct. App. 2019) (finding the Castle Doctrine inapplicable where there was no evidence that the victim unlawfully tried to enter defendant's hotel room).

¶51. The case at hand follows the path of *Howell* and *Byrd*. The evidence at trial was that Ace and Mookey arrived when Lewis was at McKnight's house. Ace spoke with Lewis, who agreed to give him his toolbox back because he had a car he needed to fix that day. Lewis eventually made his way back to his house, and Ace and Mookey showed up there. Lewis and Ace once again began talking, and Lewis testified that he told Ace to "[go ahead] up there and get the toolbox." At that point Lewis said that everything was "normal" between him and the father-son duo. According to the defendant himself, he even testified that he told Ace a second time to "go get the toolbox off the porch." Therefore, it is undisputed that Lewis told Ace to go and get his toolbox, essentially inviting him to his house to retrieve it—the same scenario that occurred in *Howell*. And as previously stated, the Castle Doctrine "requires an unlawful and forcible entry or trespass before the presumption arises that allows the use of deadly defensive force." *Howell*, 144 So. 3d at 217 (¶18). As there was no unlawful or forcible entry onto Lewis' property, there was no evidence that would have supported giving the instruction.

¶52. Based upon our review of the record and applicable caselaw, we find Lewis was not entitled to a jury instruction on the Castle Doctrine because Ace and Mookey did not unlawfully and forcibly enter onto Lewis' property.

### B. Stand Your Ground

¶53. Lewis asserts the trial court abused its discretion by denying his proposed "stand your ground" jury instruction. Specifically, he argues that had the instruction been given, then the jury "might have reached different conclusions on the two murder charges."

15

¶54. Lewis' proposed jury instruction D-11 read in pertinent part:

> While the danger that justifies one person taking another person's life must be immediate, pending, and present, such danger does not need to be unavoidable except by killing in self-defense. Steven Lewis is not required to flee from the danger to his body or life. If Steven Lewis was in a place where he had a right to be and Steven Lewis was not the initial aggressor or provoker, then Steven Lewis has no duty to flee or retreat and does not lose his right to self-defense.

¶55. We previously have considered a refusal of such an instruction in a similar case where a man shot and killed his girlfriend's ex-boyfriend during a fight. *Shaheed v. State*, 205 So. 3d 1105, 1108 (¶1) (Miss. Ct. App. 2016). At some point, the defendant and the ex-boyfriend began to struggle, with Shaheed later claiming he was trying to prevent the other man from pulling out his gun; he shot the victim "three times in the head." *Id*. "Shaheed then pulled his own gun and shot Truss three times in the head." *Id*. at 1109 (¶7).

¶56. After review, we held the trial court did not abuse its discretion in denying the jury instruction. *Id*. at 1112 (¶24). "The Mississippi Supreme Court and this Court have held that it is within the trial judge's discretion to refuse a 'stand your ground' instruction when the defendant's own testimony is that he had no time or opportunity to retreat, and there is nothing in the evidence to suggest to a reasonable juror that the defendant could have retreated but did not do so." *Id*. This Court considered Shaheed's own testimony, as well as the State's version, and "[n]either version or any other evidence in the record pointed to an opportunity to retreat." *Id*. at 1113 (¶24). And "other instructions adequately covered the general rules of law pertaining to self-defense." *Id*.

¶57. *Shaheed* and Lewis' case bear striking similarities. Like *Shaheed*, Lewis' testimony revealed that he and Mookey were fighting and that "Mookey threw the punch." Then Lewis

16

claimed Ace "started hitting me," "Mookey was hitting me, and [Ace] was like pulling me." Lewis testified that Mookey eventually pulled a gun "[o]ut of his jacket," and "I just grabbed it." He said they fought to gain control over the gun and at some point, Lewis was shot. But then he grabbed the gun and shot and killed Mookey. He stated that when Ace saw him kill Mookey, Ace tried to tackle him, and that is when he shot and killed Ace.

¶58. Like *Shaheed*, neither Lewis' testimony nor the record points to an opportunity when he could have retreated. And "other instructions adequately covered the general rules of law pertaining to self-defense." *Id*. Accordingly, we find that the trial court did not abuse its discretion in refusing the stand-your-ground jury instruction.

### III. The doctrine of retroactive misjoinder does not apply.

¶59. Lewis urges this Court to reverse his convictions of first and second-degree murder under the doctrine of retroactive misjoinder. In particular, he argues his prior convictions of being a felon in possession of a weapon "would not have been admissible if not for the felon in possession of a firearm charge." He also argues that the proof of his prior felony convictions was prejudicial.

¶60. "Retroactive misjoinder occurs when a trial or appellate court determines that while joinder of two or more counts against a defendant was initially proper, one or more of those counts should be vacated." *McLaughlin v. State*, 338 So. 3d 705, 728 (¶68) (Miss. Ct. App. 2022) (internal quotation mark omitted). "If the defendant can show that he suffered clear and compelling prejudice as a result of the evidence used to support the vacated count he or she will be entitled to a new trial on the remaining counts." *Id*. (internal quotation marks

17

omitted). "Retroactive misjoinder applies to a defendant if he was prejudiced by evidence admissible only on a charge that failed or was invalid as a matter of law." *Id*. at 728-29 (¶68) (internal quotation marks omitted). "To determine if the defendant was prejudiced on the remaining counts, this Court should analyze the strength of the State's evidence against the defendant on the remaining counts, the evidence that was presented to prove the vacated count, and other relevant details from the defendant's criminal trial and case." *Id*.

¶61.　"However, the doctrine of retroactive misjoinder *does not apply just because the jury returned a split verdict*." *Jones v. State*, 316 So. 3d 217, 222 (¶19) (Miss. Ct. App. 2021) (emphasis added). In other words, "the defendant is not entitled to a new trial on the counts of conviction simply because the jury found the government's proof on other counts unpersuasive." *Id*. (emphasis omitted). Rather, "the doctrine of retroactive misjoinder applies when the defendant was prejudiced by evidence admissible only on a charge that failed or was invalid as a matter of law." *Id*. (emphasis omitted). "In the more typical case of conviction on some counts and acquittal on others, the time to decide whether it is fair to subject a defendant to a single trial for a variety of crimes is before trial, when the defendant can complain of misjoinder or move for a severance." *Id*. (internal quotation marks omitted). "In essence, by invoking the retroactive misjoinder doctrine, the defendant in such a case is attempting to avoid the general rule that the failure to request a severance of charges prior to trial waives the issue on appeal." *Id*. at 222-23 (¶19) (internal quotation marks omitted).

¶62.　In this case, Lewis was charged with first-degree murder, second-degree murder, and being a felon in possession of a weapon. He was convicted of first and second-degree

18

murder but acquitted of being a felon in possession of a weapon. The jury rendered a split verdict, which does not trigger retroactive misjoinder. *See Reynolds v. State*, 227 So. 3d 428, 435 (¶30) (Miss. Ct. App. 2017) (holding that "the doctrine of 'retroactive misjoinder' does not apply simply because a jury acquits a defendant on one count of an otherwise valid multi-count indictment"). Accordingly, we affirm on this point.

### IV. The trial court committed harmless error in limiting cross-examination.

¶63. Lewis argues the trial court erred by "limiting Lewis's cross-examination of McKnight" because it prevented Lewis from "fully developing a theory of defense or showing the jury that McKnight might have something to gain from testifying against Lewis." While we agree it was error to limit the questioning of the witness, it does not result in reversible error.

¶64. "The trial court generally is allowed wide discretion concerning the admission of evidence offered to suggest bias on the part of a witness against the defendant." *Ambrose v. State*, 254 So. 3d 77, 100 (¶50) (Miss. 2018). "We review the trial court's ruling for an abuse of discretion." *Id*. "We will affirm the trial court's exercise of discretion unless the ruling resulted in prejudice to the accused." *Id*. (internal quotation marks omitted).

¶65. Crucially, our Rules of Evidence provide that "[t]he court may not limit cross-examination to the subject matter of the direct examination and matters affecting the witness's credibility." MRE 611(b). This rule then expressly allows wide-open cross-examination. Additionally, "[t]he right to confrontation and cross-examination extends to and includes the right to fully cross examine the witness on every material point relating to

19

the issue to be determined *that would have bearing on the credibility of the witness* and the weight and worth of his testimony." *Jackson v. State*, 924 So. 2d 531, 539 (¶24) (Miss. Ct. App. 2005).

¶66. Impeachment is a vital function of cross-examination, and so "[w]ide latitude is permitted in cross-examination to show bias or motive and the [e]ffect on a witness's credibility." *Bennett v. State*, 933 So. 2d 930, 947 (¶58) (Miss. 2006). As the Encyclopedia of Mississippi Law sets out, "[o]ne powerful tool of cross-examination is Rule 616's grant of power to question a witness about bias." David Neil McCarty, *Evidence*, 4A *Encyclopedia of Mississippi Law* § 33:65, 263 (Jeffrey Jackson, Mary Donald Miller & Donald Campbell eds., 3d ed. 2021). The rule is succinct and clear: "[e]vidence of a witness's bias, prejudice, or interest—for or against any party—is admissible to attack the witness's credibility." MRE 616.

¶67. Accordingly, we have ruled that "[p]arties may liberally cross-examine proffered witnesses regarding bias and interest." *Johnson v. State*, 756 So. 2d 4, 7 (¶8) (Miss. Ct. App. 1999). "Not only is this right secured by our rules of evidence," but "it is a function of the confrontation clauses of federal and state constitutions." *Anthony v. State*, 108 So. 3d 394, 397 (¶6) (Miss. 2013).

¶68. During the cross-examination of McKnight, counsel for Lewis asked him whether he was carrying a gun the day the victims were killed. He responded, "Didn't have a gun on me that day," and then he said, "I don't tote guns like that everyday." McKnight continued, "Ain't nothing going on in Rolling Fork to have no gun everyday." Then counsel for the

defense leapt, asking, "[Y]ou're under indictment for having a gun, aren't you?"

¶69.   The State objected, and the following discussion was had between defense counsel and the Court:

| [Counsel]: | I'm not - - I'm not trying to impeach him with a conviction for his credibility. He just said he doesn't carry a gun. He's currently charged with carrying a gun. |
|---|---|
| By the Court: | Well, if it's not a conviction, that cannot be brought up. |
| . . . . | |
| By the Court: | An indictment is not a measure of his guilt or innocence of that charge as you say . . . I'm not going to allow you to have him testify about an indictment. |
| [Counsel]: | Honestly, Judge, I think I'm allowed to ask him if he's given any consideration for that pending charge at all by cooperating with the State. I think I'm entitled - - |
| By the Court: | I'm not going to allow it in this court, period. |

In sum, the Court's reasoning for not allowing Lewis to cross-examine McKnight about the indictment was because defense counsel was inquiring about an indictment and not a conviction. As to that specific point, the trial court was correct; during the trial, the State pointed to Rule of Evidence 609, which governs "attacking a witness's character for truthfulness by evidence of a criminal conviction[.]" MRE 609. While McKnight had been indicted for carrying a gun, he had not been convicted of that crime; therefore, under Rule 609, he could not be impeached on that point.

¶70.   Yet Rule 609 was not the only consideration before the trial court. Defense counsel presented a broader alternate reason why he should be allowed to question the witness

21

regarding the pending indictment.  Counsel argued he was allowed to ask the question to determine if the witness was "given any consideration for that pending charge at all by cooperating with the State."  While not precisely articulated, it is "apparent from the context" defense counsel was trying to question the witness regarding bias and whether he had an incentive to testify in a certain way given his pending indictment.  *See* MRE 103(a)(1)(B).

¶71.    The Supreme Court has found this type of restriction to be error.  For instance, in one case the defendant's attorney sought to show that a witness had been involved in criminal activity but had not been prosecuted.  *Suan v. State*, 511 So. 2d 144, 146 (Miss. 1987).  In particular, the defendant attempted to establish that a witness "had motive for testifying falsely, and that if he did not testify falsely, he would be subject to parole revocation proceedings" and taken back to prison.  *Id*. at 147.  The trial court limited the cross-examination, and the defendant appealed.  *Id*.

¶72.    The Supreme Court stated that "it appears that the Circuit Court was of the view that the sole function of inquiry into prior criminal activity of the accused was to establish prior convictions and thereby to impeach the witness."  *Id*. at 148.  But it appeared the witness's "neck was on the line if he did not testify in a manner pleasing to the prosecution."  *Id*.  As a result, the Supreme Court held the trial court had erred when it refused to allow the cross-examination because the witness was the principal witness for the State, and because so much of the prosecution's case turned upon his credibility.  *Id*.

¶73.    In support of the trial court's limitation here, the State argues that "McKnight specifically denied that he was receiving any consideration from the State in exchange for

his testimony." As a result, the State claims *Suan* is inapplicable to this case. *See Antwine Equality Graves v. State*, 914 So. 2d 788, 796 (¶29) (Miss. Ct. App. 2005) (finding the trial court did not abuse its discretion in limiting questioning when witnesses denied receiving leniency for favorable treatment).

¶74. Under the unique circumstances of this case, we find the general rule of wide-open cross-examination and *Suan* applied, and the trial court should have allowed the cross-examination to the extent Lewis sought to determine if McKnight was receiving special consideration in his pending criminal case for testifying against Lewis. The defense expressly stated it was not seeking to impeach McKnight generally on his truthfulness due to a criminal conviction; instead, the defense was trying in a larger context to explore whether he was receiving favorable treatment for testifying. As in *Suan*, it could have been that McKnight's "neck was on the line" if he did not testify in a manner that was favorable to the prosecution. *Suan*, 511 So. 2d at 148. And this was something that McKnight "was entitled to show—or at least to attempt to show." *Id*. In limiting the cross-examination of McKnight, the trial court denied Lewis the opportunity to fully challenge McKnight's credibility. And as previously stated, "[t]he court may not limit cross-examination to the subject matter of the direct examination and matters affecting the witness's credibility." MRE 611(b).

¶75. Notwithstanding the error, we are assured it did not impact the result at trial. "An error is considered harmless when the weight of the evidence against [the defendant was] sufficient to outweigh the harm done by allowing admission of the evidence." *Bays v. State*,

23

344 So. 3d 303, 307 (¶12) (Miss. Ct. App. 2022) (internal quotation mark omitted). A "[h]armless-error analysis prevents setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Croft v. State*, 283 So. 3d 1, 11 (¶34) (Miss. 2019) (internal quotation mark omitted). And "[w]e do not reverse a conviction for an erroneous evidentiary ruling unless the error adversely affects a substantial right of a party, or in other words, unless the ruling prejudiced the accused." *Id.* (internal quotation mark omitted).

¶76. Indeed, "[e]ven errors involving a violation of an accused's constitutional rights may be deemed harmless beyond a reasonable doubt where the weight of the evidence against the accused is overwhelming." *Ambrose*, 254 So. 3d at 105 (¶70). "The well-settled standard for determining whether a constitutional error is harmless is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (internal quotation marks omitted). "The constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to harmless error analysis[.]" *Id.*

¶77. Here, the evidence presented at trial of Lewis' guilt was considerable. Candace Macon testified that Lewis shot and killed Ace and Mookey. Henry Denis testified he saw Lewis shot Ace in the back three times, and saw Mookey's dead body lying in the road. Critically, Lewis testified and admitted to shooting and killing both Ace and Mookey. He specifically told the jury that he stole the toolbox because Ace owed him money for drugs, which is what started the fight that led to the killings. But the jury chose to reject Lewis'

24

theory of self-defense.

¶78. Therefore we find that the error in refusing to allow Lewis to cross-examine McKnight about his pending indictment was harmless.

### V. The objection to the testimony of Investigator Rusty Clark was waived.

¶79. Lewis also contends that Investigator Clark's testimony that Lewis shot himself was "inadmissible lay opinion testimony." Specifically, Lewis's testimony that "[t]he entry and exit wounds caused by a bullet are typically left to expert testimony[.]" Lewis argues the witness's claims "require specialized medical knowledge."

¶80. "This Court reviews a trial court's decision to allow or exclude evidence under an abuse-of-discretion standard." *Thames v. State*, 310 So. 3d 1163, 1170 (¶34) (Miss. 2021). "[U]nless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, the trial judge's decision will stand." *Miller v. State*, 297 So. 3d 275, 284 (¶27) (Miss. Ct. App. 2019) (internal quotation marks omitted). "We only reverse a case when the admission or exclusion of evidence results in prejudice and harm or adversely affects a substantial right of a party." *Id.* (internal quotation mark omitted).

¶81. A party must "timely object[] or move[] to strike" in order to preserve an evidentiary error for appeal. MRE 103(a)(1)(A). To ensure the objection is preserved, "a party" must both "timely object[]" and "state[] the *specific* ground, unless it was apparent from the context[.]" MRE 103(a)(1)(B) (emphasis added). So Rule 103 requires objections to be made "quickly and with specificity." McCarty, *supra* ¶66, § 33:5, at 211. "Failure to make a contemporaneous objection constitutes waiver of the objection and cannot be raised for the

first time on appeal because the trial court is denied the opportunity to consider the issue and possibly remedy the situation." *Goldsby v. State*, 240 Miss. 647, 123 So. 2d 429, 441 (1960). "The failure of an objection is fatal." *Walker v. State*, 913 So. 2d 198, 238 (¶148) (Miss. 2005).

¶82.   At trial, the State asked Investigator Clark, "[D]id you write in your report that you thought the defendant shot himself?" Defense counsel objected and, outside the hearing of the jury, argued, "That is an opinion that's not based on any of the evidence that we've seen so far," and any response would be "prejudicial" and mislead the jury. The State responded that the officer was not just "pull[ing] out of his head" the answer, but it was based on his report—"all the interviews, all the physical evidence he reviewed, everything, everything." Defense counsel then argued a response would be "all hearsay." The trial judge concluded, "I'm going to go ahead and allow it." Defense counsel never objected on the basis that the testimony would be inadmissible expert testimony and never used the words "expert" or "lay."

¶83.   One case dealt with a similar scenario involving questionable testimony that had been admitted without objection. *Kirk v. State*, 160 So. 3d 685 (Miss. 2015). There, a deputy responded to a domestic violence call and testified at trial that he noticed "strangulation marks" around the victim's neck. *Id.* at 691 (¶11). The Court began its analysis by pointing out that Kirk did not object to this testimony at trial. *Id.* at 692 (¶16). And because of this, "preservation of an issue for appeal normally requires a contemporaneous objection at trial." *Id.* at (¶17).

¶84. Kirk's argument on appeal set forth that "[w]ith no expert witness, no eye-witnesses, and witnesses with mere reiterations of Casey Kirk's testimony, the State improperly introduced medical expert testimony through a lay law enforcement witness to salvage its case." *Id*. Notably, the Supreme Court pointed out that "[w]hile Deputy Strait may have been able to testify regarding his observations, e.g., that Casey's neck had red marks on it, his testimony that it appeared Casey had been strangled constituted the sort of testimony properly reserved to an expert." *Id*. at 693 (¶19).

¶85. Nevertheless, the Supreme Court found "the defense waived any potential objection to this testimony by, instead of objecting to or moving to strike Strait's testimony regarding strangulation or moving for a mistrial, emphasizing it on cross examination." *Id*. at (¶20). But instead of objecting, the defense emphasized the deputy's testimony regarding strangulation on cross-examination. *Id*. at (¶20). Rather than move for a mistrial or object to the testimony, "defense counsel interrogated Strait not only in an effort to call into question Strait's expertise regarding strangulation but also to adduce one of the defense's theories of the case, that the marks on Casey's neck had been self-inflicted." *Id*. at 694 (¶21). Because of this, "[d]efense counsel cannot now attempt to assign this error to the trial court." *Id*. at 694-95 (¶22).

¶86. Just as in that case, defense counsel here never objected to the testimony on the basis that it would require expert knowledge. And just like *Kirk*, here, defense counsel specifically asked Investigator Clark whether Lewis shot himself:

> The Defense: Now, you testified earlier that you based your report where you said that he shot himself on the physical

|            |                                                              |
|------------|--------------------------------------------------------------|
|            | evidence, right?                                             |
| Clark:     | Yes.                                                         |
| The Defense: | What physical evidence was that?                           |
| Clark:     | The gunshot wound itself where it went in, where it came out, the statements from the witnesses. |

¶87. While the case at issue slightly differs from *Kirk* in that counsel for Lewis *did* object on some grounds—namely, lack of foundation and hearsay—and in *Kirk* there was no objection at all, the situation is still controlled by precedent. Generally speaking, absent a timely and specific objection, an argument is not preserved for appeal.

¶88. Furthermore, Lewis' counsel, like the defense counsel in *Kirk*, emphasized and reiterated the testimony on cross. Lewis himself testified that the wound was not self-inflicted. In *Kirk*, the Supreme Court held that this would further bar consideration issues since it was invited error. 160 So. 3d at 694 (¶21). The Court reasoned that "defense counsel interrogated Strait not only in an effort to call into question Strait's expertise regarding strangulation but also to adduce one of the defense's theories of the case, that the marks on Casey's neck had been self-inflicted." *Id*. And as a result, "[d]efense counsel cannot now attempt to assign this error to the trial court." Accordingly, we find no merit to this argument.

### *Issues Raised Pro Se*

**VI.     The right to a speedy trial was not violated.**

¶89. Lewis filed a pro se supplemental brief raising five additional issues for appeal. First, Lewis argues that his constitutional right to a speedy trial was violated because nearly four

years passed between his arrest and trial.

¶90. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI. Our Supreme Court has determined that a delay of eight months or longer between the date of the arrest and the defendant's trial is presumptively prejudicial. *Ward v. State*, 346 So. 3d 868, 871 (¶6) (Miss. 2022). "A 'presumptively prejudicial delay' acts as a triggering mechanism" for the balancing test set out by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972). *Ward*, 346 So. 3d at 872 (¶6). In *Barker*, "the United States Supreme Court established a four-part balancing test to decide whether or not a criminal defendant has been denied his Constitutional right to a speedy trial." *Hall v. State*, 984 So. 2d 278, 282 (¶8) (Miss. Ct. App. 2006). The Mississippi Supreme Court has adopted the *Barker* test, which provides that "the trial judge is to balance: '(i) length of delay, (ii) the reason for the delay, (iii) the defendant's assertion of his right, and (iv) prejudice to the defendant.'" *Id.* (quoting *Price v. State*, 898 So. 2d 641, 648 (¶10) (Miss. 2005)).

¶91. Under this Court's standard of review, we "will uphold a decision based on substantial, credible evidence" as to whether the trial delay resulted from good cause. *DeLoach v. State*, 722 So. 2d 512, 516 (¶12) (Miss. 1998). In Lewis' case, the trial court denied Lewis' pro se motion for a speedy trial as moot because the trial was scheduled to begin a month after the motion was filed. Thus, the trial court did not make any findings of fact. Where the trial court does not articulate findings of fact, this Court "act[s] de novo in performing the *Barker* analysis." *Id.* at (¶15). So we will review the *Barker* factors de novo.

### A.     Length of Delay

¶92.     "The constitutional right to a speedy trial attaches 'at the time of a formal indictment or information or else the actual restraints imposed by arrest and holding to a criminal charge.'" *Johnson v. State*, 235 So. 3d 1404, 1417 (¶45) (Miss. 2017) (quoting *Rowsey v. State*, 188 So. 3d 486, 495 (¶24) (Miss. 2015)).  Lewis was arrested on November 27, 2017, and his first trial began 1,036 days, or approximately 35 months, later on September 28, 2020.  A mistrial was declared, and Lewis' second trial began on March 15, 2021.  Because the delay between Lewis' arrest and the first trial was more than eight months, it is presumptively prejudicial and triggers a *Barker* analysis.

¶93.     In contrast, the time period between the mistrial and second trial is considered separately. *Kinzey v. State*, 498 So. 2d 814, 816 (Miss. 1986).  When a mistrial results, "[t]he time for retrial then becomes a matter of discretion with the trial court to be measured by the constitutional standards of reasonableness and fairness under the constitutional right to a speedy trial as enunciated in *Barker* . . . ." *Id.*  The 168-day delay between the mistrial and second trial is less than eight months and does not trigger a *Barker* analysis.  Accordingly our sole focus is on the presumptively prejudicial delay between Lewis' arrest and his first trial.

### B.     Reason for Delay

¶94.     "Once a delay is found to be presumptively prejudicial, the burden of proof shifts to the State to show cause for the delay." *Stark v. State*, 911 So. 2d 447, 450 (¶11) (Miss. 2005).  "[D]ifferent weights should be assigned to different reasons.  A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the

30

government"; whereas, "[a] more neutral reason such as negligence or overcrowded courts should be weighted less heavily . . . ." *Barker*, 407 U.S. at 531. "A delay caused by the actions of the defendant, such as a continuance, tolls the running of the time period for that length of time, and this time is subtracted from the total amount of the delay." *Wiley v. State*, 582 So. 2d 1008, 1011 (Miss. 1991).

### i. Pre-Indictment Delay

¶95. Lewis was arrested on November 27, 2017, and indicted on January 16, 2019. The State cannot explain the delay, and the record is silent as to what occurred between Lewis' arrest and indictment. "Where the record is silent regarding the reason for the delay, then the time is counted against the State because the State bears the risk of non-persuasion on the good cause issue." *Travis v. State*, 13 So. 3d 320, 328 (¶26) (Miss. Ct. App. 2008) (citing *Vickery v. State*, 535 So. 2d 1371, 1375 (Miss. 1988)). However, delays prior to indictment are considered investigative delays, and an "investigative delay is fundamentally unlike delay undertaken by the [g]overnment solely to gain tactical advantage over the accused." *Harris v. State*, 311 So. 3d 638, 665 (¶80) (Miss. Ct. App. 2020) (quoting *State v. Woodall*, 801 So. 2d 678, 682 (¶15) (Miss. 2001)). Prosecutors cannot seek an indictment "until they have probable cause to believe an accused is guilty," and "indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause." *Id.* (quoting *Woodall*, 801 So. 2d at 682 (¶15)). And "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." *Id.* (quoting *Woodall*, 801 So. 2d at 682 (¶15)).

31

¶96.    Taking into consideration the State's lack of explanation for the delay between Lewis'

arrest and indictment, but also that the delay occurred during the investigatory period of

Lewis' case, the 415-day delay prior to indictment weighs only slightly in Lewis' favor.

### ii.    Post-Indictment Delay

¶97.    After Lewis was indicted on January 16, 2019, his counsel began seeking discovery

on February 27, 2019.  Transport orders were entered for Lewis' appearance in court on

February 27, 2019, and March 19, 2019, though the record does not specify the purpose of

the appearances.  In early June 2019, the court issued subpoenas for Dr. Mark LeVaughn,

to testify between July 1 and 3, 2019, and to produce autopsy reports.  Trial was set for

September 30, 2019.  Between June 2019 and September 25, 2019, multiple subpoenas were

issued and returned for State witnesses to appear at the September 30, 2019 trial.

¶98.    In early September 2019, Lewis' trial attorneys moved to withdraw because Lewis had

not paid them, and they were "never properly retained."  The motion was granted in an order

entered on September 23, 2019, and public defenders Noah Drake and Christopher Green

were appointed as counsel.  Trial was reset for December 9, 2019.  The trial court's order

resetting the trial does not specify why the trial was reset or if a motion was made to continue

the trial.  Presumably, the trial was reset due to counsel's withdrawal and the appointment

of the two public defenders.

¶99.    In October and November 2019, both sides filed multiple pretrial motions, and the

court issued subpoenas for State witnesses to appear at the December 9, 2019 scheduled trial.

On November 13, 2019, Lewis entered a petition to plead guilty, though no further action

32

was taken on the petition. Additional subpoenas were issued on December 2, 2019, for State witnesses to appear at the December 9, 2019 trial. On December 2, 2019, Lewis notified the district attorney's office that a potential conflict of interest existed with one of its assistant district attorneys. On December 6, 2019, Lewis' counsel emailed the trial court and counsel opposite a motion to disqualify the Ninth Judicial District Attorney's Office, as well as a motion for bond and a motion to quash and dismiss his indictment. The basis of the motion to disqualify the district attorney's office was that an assistant district attorney, who had taken office in January 2019, had a conflict because she had been temporarily assigned to Lewis' case in January 2018 when she was a public defender. A hearing was held on the motion on December 9, 2019, and the motion was granted the following day.

¶100. The next action reflected in the record is a March 13, 2020 transport order for Lewis to appear in court on March 16, 2020. Also, on March 13, 2020, our Supreme Court entered the first of a series of Emergency Administrative Orders recognizing the national emergency related to COVID-19 and authorizing trial courts "to exercise their sound discretion in extending deadlines, rescheduling hearings and trials and any other matters by case specific actions or by general orders." *In re: Emergency Order Related to Coronavirus (COVID-19)*, No. 2020-AD-00001-SCT (Miss. March 13, 2020). Notwithstanding, the case moved forward, and multiple motion hearings were held between May and September 2020, with some attorneys appearing via Zoom, including hearings on Lewis' motion for bond, motion to quash his indictment, motion to suppress his statement, and motion to change venue, all of which were denied. Hearings were also held on the State's two motions in limine and a

33

motion to amend the indictment to charge Lewis as a habitual offender. The motion to amend the indictment was granted. The State also filed a third motion in limine and a motion for reciprocal discovery, which the court also granted.

¶101. During the first week of September 2020, Lewis' appointed counsel Drake and Green moved to withdraw, and Lewis joined in the motion. At a September 10, 2020 hearing, Lewis testified that he was unhappy with his appointed counsel because they had not communicated with him about the case. He stated, "I want to fire them and either hire some additional attorney or proceed pro se by myself . . . ." The judge stated, "You do realize that you have a trial coming up on September 28th?" Lewis responded, "Yes, ma'am." Lewis' counsel then asked for a "couple of weeks maybe" for Lewis to find new counsel. Lewis followed this by saying, "Maybe a month or two I'd be ready." The State asked that the record reflect that Lewis was moving for a continuance "and that it not be held against the State for speedy trial purposes." The judge responded, "Certainly," and pointed out to Lewis that Drake and Green "have been very active in representing you over the last year . . . from the Court's perspective." The trial court granted the motion to withdraw in part. Drake was allowed to withdraw, but Green was directed to remain as the attorney of record "unless and until" Lewis was able to hire his own attorney. The trial court directed Lewis to notify the court within a week if he had found another attorney to represent him. The circuit court denied the request to continue the trial date. Lewis responded that a week "is not enough sufficient time for me to get counsel." The judge then stated, "[We] will revisit this next Thursday at 9 o'clock."

¶102. On September 24, 2020, a pretrial motions hearing was held at which Lewis asked the court to consider his pro se motion for a speedy trial; however, Lewis simultaneously moved for a continuance and raised several other motions. The trial court denied the speedy-trial motion, finding it was moot because the trial was set to begin in four days. The court also denied Lewis' motion for a continuance. At the hearing, the State pointed out that despite the impending trial, the defense had yet to provide any discovery, including a witness list. The court ordered Lewis to provide a witness list by 8 a.m. the following morning, and the prosecution stated that it did not have an issue with that deadline. The trial began as scheduled on September 28, 2020.

¶103. In sum, the post-indictment delay was 621 days. However, much this period of delay is attributable to Lewis' own motions. The record shows that the State was prepared to try the case on September 30, 2019, which was 257 days after Lewis was indicted. But Lewis' counsel moved to withdraw shortly before the first scheduled trial, and public defenders were appointed and needed time to prepare. The State was again prepared to try the case on December 9, 2019, but Lewis moved for the first time just prior to the second trial date to disqualify the district attorney's office. The motion was granted, and the case proceeded forward to trial in September 2020 after multiple motion hearings, even amidst restrictions that year due to the COVID-19 pandemic, and despite Lewis' pro se attempt to fire his appointed counsel and request for a continuance the week prior to trial.

¶104. After review, we find that the 621-day delay between Lewis' indictment and first trial is neutral at best and in some ways weighs against Lewis due to his deliberate actions. There

was no evidence of any "deliberate attempts" by the State to delay the trial. *Barker*, 407 U.S. at 531. To the contrary, the record shows that the State was ready to proceed with trial on all the dates the court set, but motions filed by Lewis in the days leading up to the first and second trial dates caused the trials to be delayed. "Any delays in prosecution attributable to a defendant tolls the running of the time period." *Ford v. State*, 589 So. 2d 1261, 1262 (Miss. 1991). Specifically, the passage of time "during the consideration of numerous defense motions" is not counted against the State. *Brewer v. State*, 725 So. 2d 106, 119 (¶55) (Miss. 1998). Nor can "[a] delay caused by the withdrawal of the defendant's attorney which entails allowing the new attorney a reasonable time to become familiar with the case and prepare for trial . . . be weighed against the State." *Manix v. State*, 895 So. 2d 167, 175 (¶13) (Miss. 2005). For these reasons, we find that the post-indictment delay does not weigh against the State.

### iii. Balancing the Weight of the Delay

¶105. The pre-indictment delay spanned 415 days of the total 1,036 days of delay in this case. The pre-indictment delay weighs slightly in Lewis' favor because the State has provided no explanation for the delay. However, because the post-indictment delay is mainly attributable to multiple defense motions and Lewis' changing counsel, the 621-day post-indictment delay weighs in favor of the State. Considering the totality of the circumstances, we find this factor weighs more heavily in favor of the State.

### C. Assertion of Right to a Speedy Trial

¶106. Lewis first asserted his right to a speedy trial approximately two years and nine

36

months after his arrest, and his trial began approximately a month after his speedy-trial demand.

¶107. "Although it is the State's duty to ensure that the defendant receives a speedy trial, a defendant has some responsibility to assert this right." *Taylor v. State*, 162 So. 3d 780, 785 (¶10) (Miss. 2015) (quoting *Bateman v. State*, 125 So. 3d 616, 630 (¶48) (Miss. 2013)). "[A] defendant's failure to demand a speedy trial between his arrest and indictment is 'critical' to the analysis of a speedy-trial claim." *Id.* (quoting *Bateman*, 125 So. 3d at 630 (¶49)). "[F]ailure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532.

¶108. This factor has been "weighed . . . against defendants who, although they eventually asserted the right, allowed a 'significant amount of time' to pass after arrest before demanding a speedy trial." *Id.* (quoting *Bateman*, 125 So. 3d at 630 (¶48)). In *Bateman*, the defendant was held in custody for 308 days before he was indicted. *Bateman*, 125 So. 3d at 630 (¶45). He moved for a speedy trial two days after he was arraigned, and the trial court set his trial date for two and a half months later. *Id.* at 631 (¶50). The Mississippi Supreme Court held that because "Bateman failed to assert his right to a speedy trial in a timely manner and offered no evidence of his inability to do so," this factor weighed against Bateman. *Id.*; *see also Wall v. State*, 718 So. 2d 1107, 1113 (¶25) (Miss. 1998) (holding that a defendant's assertion of his right to a speedy trial two months before his trial began did not satisfy this *Barker* factor).

¶109. Lewis never asserted his right to a speedy trial between his arrest and indictment.

37

Lewis' pro se motion for a speedy trial is dated August 28, 2020, and was filed on the circuit court's docket on September 17, 2020. The circuit court denied the motion as moot because the trial was set to begin on September 28, 2020. At the time Lewis prepared his pro se motion for a speedy trial, we know that Lewis was aware that trial was set for September 28, 2020, because it was discussed at the August 20, 2020 hearing at which Lewis was present. Further, Lewis' motion for a speedy trial was contradicted by his own simultaneously raised pro se motion for a continuance.

¶110. Because Lewis failed to make a timely assertion of his right to a speedy trial, and he moved for a continuance just prior to trial, this factor weighs in favor of the State.

### D. Prejudice

¶111. To determine whether a presumptively prejudicial delay resulted in actual prejudice, we must consider the three interests that the right to a speedy trial was meant to protect: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Jenkins v. State*, 947 So. 2d 270, 277 (¶21) (Miss. 2006) (quoting *Barker*, 407 U.S. at 532).

¶112. Lewis argues that he was prejudiced because (1) his mother and witness, Barbara Newell, died prior to trial; and (2) he was not able to cross-examine the original pathologists, Dr. LeVaughn and Dr. Davis, while they were still employed with the Mississippi Crime Lab, and the State was "aware that the pathologist Dr. LaVaughn and Dr. Davis would not be available due to being on leave for allegedly giving false testimony and falsifying autopsy report in a non-related death investigation . . . ."

38

¶113. First, Lewis fails to identify when his mother died or how she would have aided his defense. The record does not describe how or if Newell would have testified. Second, the record reflects that Dr. LeVaughn was subpoenaed to testify at Lewis' earlier scheduled trials, and the State was prepared to call him as a witness at those trials. However, the trials were delayed due to last-minute motions filed by Lewis and later a change of venue. *Simmons v. State*, 678 So. 2d 683, 685 (Miss. 1996) ("If the defendant is the cause of the delay, he cannot complain thereafter."). Finally, Dr. Davis was not subpoenaed by the State or Lewis, so Lewis cannot now complain he was unable to cross-examine him.

¶114. Because Lewis has failed to assert any actual prejudice, this factor favors the State.

¶115. "[W]here, as here, the delay is neither intentional nor egregiously protracted, and where there is a complete absence of actual prejudice, the balance is struck in favor of rejecting [the defendant's] speedy trial claim." *Taylor*, 162 So. 3d at 787 (¶17) (quoting *Watts v. State*, 733 So. 2d 214, 236 (¶67) (Miss. 1999)); *see also Manix*, 895 So. 2d at 175 (¶15) (finding a "delay of 1,430 days, while extreme, did not violate [a defendant's] statutory right to a speedy trial" when most of the delay "resulted from the crime lab backlog or appointment of new counsel").

¶116. Balancing the *Barker* factors, we find that Lewis' right to a speedy trial was not violated.

### VII. The motion-to-dismiss-the-indictment argument is not supported by authority.

¶117. Secondly, Lewis asserts that the trial court erred in denying his motion to quash and dismiss his indictment. But he has failed to cite any authority in support of this assertion.

¶118. Critically, an appellant has a duty to support his arguments with reasons and authorities. *Hollis v. State*, 320 So. 3d 518, 521 (¶8) (Miss. 2021) (internal quotation marks omitted). And "[a]rguments that fail to cite supporting material are procedurally barred." *Moffite v. State*, 309 So. 3d 529, 536 (¶30) (Miss. Ct. App. 2019); *accord* MRAP 28(a)(7) ("The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on.")

¶119. Because Lewis did not support his argument with authority, we do not address this argument.

**VIII. The State did not commit prosecutorial misconduct in closing.**

¶120. Lewis asserts he is entitled to a new trial based off remarks the prosecutor made in closing argument: "Let him know that everyone's life matters, even people from Rolling Fork, Mississippi, especially people from a speck on the map." Essentially, Lewis is arguing he deserves a new trial because the State's comments constituted an improper send-a-message argument.

¶121. Counsel for Lewis did object to this portion of the State's closing argument, but failed to make any specific objection:

| | |
|---|---|
| The Defense: | I did want to just for the record make an objection to counsel's argument that the jury should punish my client for a comment that Mr. McNeil said that we should show Mr. McNeil that Rolling Fork isn't some speck on the map. . . . |
| The Court: | That's what he said. I heard it, too . . . it's neither here nor there, but we do take note of the objection . . . . |

¶122. "Our supreme court has repeatedly condemned the 'send a message' argument and warned prosecutors accordingly." *Miskell v. State*, 270 So. 3d 23, 35 (¶43) (Miss. Ct. App. 2018). Two questions exist to determine whether a send-a-message argument reaches the level of "reversible error." *Id*. "This Court first looks at whether the argument is procedurally barred because defense counsel failed to object to the statement at trial." *Id*. (internal quotation marks omitted).

¶123. Even without an objection, "we will review on appeal a claim that a prosecutor made an improper send-a-message argument if the argument is so inflammatory that the trial judge should have objected on his own motion." *Id*. "Second, this Court considers whether the defense counsel provoked the prosecution to make the challenged statement." *Id*. Finally, "[a]fter considering the two threshold questions, the Court then must determine (1) whether the remarks were improper, and (2) if so, whether the remarks prejudicially affected the accused's rights." *Id*.

¶124. Here, while Lewis' counsel did object to the comments, there were no articulated grounds for objection. Nonetheless, even if preserved, we find the stray remark in closing was prompted by a statement defense counsel made. The State's comments that Rolling Fork was a "speck on the map" were made in response to defense counsel's cross-examination of Chief Roy Sias. During that cross, defense counsel asked the Chief the following:

| The Defense: | And Rolling Fork - - I mean, I've been there recently. It's just a - - like kind of a dot on the map, right? |
| Chief Roy Sias: | Well, to us it's a big town.   When you're from |

41

Mayersville, you really wanted to get to Rolling Fork because you had Chuck's, Double Quick, places like that. Mayersville you had one store. That's all.

¶125. The State's remark that "especially people from a speck on the map" was in response to the aforementioned exchange between Lewis' counsel and Chief Sias. Per *Miskell*, we find that the remark was not so inflammatory that the trial judge should have sua sponte halted the closing, and that it was in response to a comment by defense counsel. As a result, we will inquire no further and find no error.

### IX. It was not error to allow the jury to view a transcript of Lewis' recorded statement.

¶126. For Lewis' fourth pro se claim, he argues it was reversible error that a transcript of his recorded statements to law enforcement was published to the jury.

¶127. Before he was indicted, Lewis gave a lengthy statement to two investigators. He was provided his *Miranda* rights before giving the statement. In the statement, Lewis essentially explained his version of events that led to the murders of Ace and Mookey. In his statement, he said Mookey pulled out a gun and the two men were fighting over it, which resulted in the gun going off and shooting Lewis in the leg. He then said he eventually grabbed the gun, shooting Mookey. Realizing that Lewis had just shot Mookey, Ace rushed Lewis and tried to tackle him, and that is when he shot Ace for the first time. Lewis also admitted to trying to "shoot [Ace] in his butt." And at some point, Ace kept trying to reach into his jacket, so Lewis said he shot him a second time.

¶128. Prior to trial, counsel for Lewis moved to suppress the transcript of the audio statement, claiming that it was taken in violation of the defendant's rights, as Lewis began

42

to claim he had asked for an attorney but was coerced into giving the statement without one. During the hearing, a large amount of the argument focused on the dates of when exactly Lewis was provided his *Miranda* rights, made his initial appearance, and was actually interviewed.

¶129. The trial court weighed the credibility of the two officers along with Lewis and found the former was more trustworthy. In its ruling, the trial court stated, "[B]ut the Court, after taking all of this into consideration, does find that the Waiver Form is sufficient and the Initial Appearance Form apparently came after that and so the Motion to suppress will be denied."

¶130. On appeal, Lewis claims that the statement should be suppressed. But the State points out that after the pretrial ruling by the trial court, Lewis himself sought to introduce the statement and then his counsel later agreed to its admission, subject to certain redactions.

¶131. We have long held that "[w]here a party has agreed to the admission of evidence, he will not generally be heard to object to the admission of that evidence on appeal." *Farrish v. State*, 840 So. 2d 820, 822 (¶7) (Miss. Ct. App. 2003); *see also Butler v. State*, 300 So. 3d 550, 557-58 (¶33) (Miss. Ct. App. 2020) ("Absent the trial court's abuse of discretion, it would be unreasonable for this Court to reject the admissibility of evidence that [a defendant] himself agreed to introduce at trial.")

¶132. Prior to trial, Lewis himself was heard by the trial court stating that it wanted the statement to be admissible at trial, saying "[t]he defendant would like to keep his statement because it's the defendant's intentions that count." Lewis continued, "[T]hat statement

43

within itself clearly lets the Court know the mindset of the defendant at that time."

¶133. Then after the close of evidence, counsel for Lewis went through an extended discussion with the State about what portions of the transcript should be admitted. The transcript, which is 37 pages long, was loaded with references to other crimes and drug use by Lewis. In each instance where defense counsel protested prejudice, the State agreed to a redaction. Notably, multiple pages were completely blanked out.

¶134. We find that Lewis agreed to the admission of his recorded statement, subject to redactions. Therefore we will not find error in its admission at trial. To the extent there was any discrepancy in the dates or other evidentiary matters, it was resolved by the trial court and was within its discretion to do so.

### X. There was sufficient evidence to convict the defendant that was not against the overwhelming weight of the evidence.

¶135. In his final pro se issue, Lewis attempts to argue that the evidence was insufficient to convict him of the crimes and that his convictions of first-degree and second-degree murder are against the overwhelming weight of the evidence. In particular, he points to Candace Macon's testimony and Chief Roy Sias' testimony relating to the time frame "from Lewis talking until [the] first shot [and] final shot."

¶136. We determine the sufficiency of the evidence by viewing "the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the essential elements of the crime beyond reasonable doubt." *Davis v. State*, 347 So. 3d 1205, 1209 (¶6) (Miss. Ct. App. 2022) (internal quotation marks omitted). "In determining whether the weight of the evidence supports a verdict, the standard of review is that an

appellate court will only disturb a verdict if the verdict is so contrary to the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable injustice." *Id*.

¶137. The jury heard Lewis himself admit on the stand that he pointed a gun at Ace and Mookey and fatally shot them. This evidence was legally sufficient for a rational juror to convict Lewis.

¶138. The only other issue the jury was left to resolve was whether Lewis acted in self-defense. And the jury was left to determine the trustworthiness of Candace Macon and Chief Sias' testimony relating to Lewis' self-defense theory. They ultimately determined he had not acted in such a way, finding him guilty of first-degree and second-degree murder. Lewis fails to offer any support to his contentions that the testimony of Macon or Chief Sias results in "an unconscionable injustice" regarding the verdict of the jury.

¶139. Viewing the evidence presented at trial in the light most favorable to the State, we find that sufficient evidence supported Lewis' convictions that any reasonable juror could have found him guilty beyond a reasonable doubt. Lewis' argument is without merit, as the jury considered all the evidence presented and ultimately rejected Lewis' theory of events. He has failed to show how affirming his convictions and sentences on appeal will sanction an unconscionable injustice.

## CONCLUSION

¶140. For the foregoing reasons, Lewis' convictions and sentences are affirmed.

¶141. **AFFIRMED.**

45

**CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD AND EMFINGER, JJ., CONCUR. BARNES, C.J., AND LAWRENCE, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. SMITH, J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., AND LAWRENCE, J.**

**SMITH, J., CONCURRING IN PART AND IN RESULT:**

¶142. During Lewis's trial, the circuit court limited defense counsel's cross-examination of a witness about an alleged pending indictment unrelated to this crime. In affirming Lewis's two murder convictions, the majority holds the circuit court's ruling to be harmless error. However, because I find the circuit court properly limited Lewis's cross-examination, I concur in part and in the result with the majority's opinion.

¶143. In one of his multiple assignments of error, Lewis takes issue with the trial court's decision limiting his ability to cross-examine McKnight, one of the State's witnesses, and contends that the court erred when it precluded Lewis from inquiring about a pending indictment against McKnight. Lewis argues that by not allowing his defense counsel to question McKnight about an allegedly pending indictment, the trial court prevented him from "showing the jury that McKnight might have something to gain from testifying against Lewis."

¶144. The majority correctly points out that cases like *Bennett v. State*, 933 So. 2d 930 (Miss. 2006), point to the rule set forth in *Suan*,[3] where our supreme court has held that "wide latitude is permitted in cross-examination to show bias or motive and the [e]ffect on

---

[3] *Suan v. State*, 511 So. 2d 144, 148 (Miss. 1987) ("[O]ne accused of a crime has the right to broad and extensive cross-examination of the witnesses against him, and especially is this so with respect to the principal prosecution witness.").

a witness's credibility." *Id*. at 947 (¶58). However, our courts also consistently have held that "the rule in *Suan* has not applied to every circumstance." *Graves v. State*, 914 So. 2d 788, 796 (¶29) (Miss. Ct. App. 2005). Specifically, "[i]n *Craft v. State*, 656 So. 2d 1156 (Miss.1995), the Mississippi Supreme Court distinguished *Suan* when it held that where there is no evidence that indicates or even implies that a witness testified favorably in exchange for favorable treatment, *Suan* is inapplicable." *Graves*, 914 So. 2d at 796 (¶29). In *Graves*, the defendant argued that the trial court improperly limited his cross-examination of two key witnesses and "erred by excluding evidence that . . . [the witnesses] received leniency with respect to [the] unrelated charges that were pending." *Id*. at 795-96 (¶¶24-25). On appeal, this Court held,

> [T]here is no evidence in the record that [the witnesses] received leniency at all, and Graves does not cite to a specific portion of testimony in the transcript or record that indicates [the] witness received leniency. In fact, [the two witnesses] both denied they received leniency in exchange for their testimony.

*Id*. at 796 (¶25). After thorough a review, this Court ultimately found *Suan* inapplicable in *Graves* on the basis that during a proffer outside the presence of a jury, "both [witnesses] denied that they received any leniency in exchange for favorable testimony" against Graves, and there was no evidence that either witness testified favorably in exchange for favorable treatment. *Id*. at (¶29).

¶145. In *Scott v. State*, 796 So. 2d 959, 961 (¶6) (Miss. 2001), the defendant's ability to cross-examine a key State witness was limited to the extent that the trial court "allowed [Scott] to question Burrow regarding her prior convictions, but not about whether there were

47

any pending indictments against Burrow."[4] Scott argued that the trial court should have permitted her to ask "question[s] about Burrow's possible pending indictments . . . because it could show why the witness may have been favorable to the State." *Id.* at 961 (¶6).[5] Scott's argument relied on *Suan*, in part, and "allude[d] to the fact that both the State and Burrow claimed that Burrow did not receive help with her prior conviction, but that the jury was denied evidence about cases still pending against Burrow." *Id.* at 963 (¶11). According to Scott, "Burrow had an interest in keeping the District Attorney's office happy" because Burrow allegedly had pending indictments, and Scott believed that she "should have been able to show this to the jury through cross-examination." *Id.* at (¶12).

¶146. On appeal, our supreme court found that "[a] thorough review of the record does not reveal whether Burrow had any pending indictments at the time of her being questioned at this trial." *Id.* at 961 (¶6). The court held that "[t]he lack of evidence in the record that there were any pending indictments against Burrow" was a crucial factor in its decision to affirm the ruling of the trial court. *Id.* at 964 (¶16).[6] Ultimately, the trial court's decision refusing

---

[4] Scott alleged that her defense counsel "not being allowed to cross-examine Burrow as to [Burrow's] pending indictments deprived [Scott] of the opportunity to adequately confront the witness against her," and thus, was reversible error by the trial court. *Scott*, 796 So. 2d at 964 (¶14).

[5] She further contended that in cross-examining Burrow, her defense counsel "should have been afforded the opportunity to 'ferret out' any deals or Burrow's hope for possible deals with the State." *Scott*, 796 So. 2d at 963 (¶11).

[6] The *Scott* court's ruling further stated,

It is not as if Burrow's character and past were never put before the jury in this case. Direct and cross-examination clearly revealed that she had worked as an informant for the State in this case; that she had a prior conviction for

48

to "allow[] Scott to cross-examine Burrow about pending indictments against her" was not reversible error. *Id*. at (¶17).

¶147. Here, the evidentiary record before this Court includes transcripts from Lewis's trial that show when discussing the day of the murders, defense counsel asked McKnight on cross-examination, "You said you didn't have a gun on you that day?" McKnight answered, "No, sir," and after defense counsel prompted him for further explanation, McKnight stated, "Didn't have a gun on me that day. I don't tote guns like that every day. Ain't nothing going on in Rolling Fork to have no gun every day." At that point, defense counsel inquired, "You're under indictment for having a gun, aren't you?" and the prosecutor objected. Outside the presence of the jury, defense counsel initially responded to the objection by stating that the indictment was offered as proof "that refutes the statement he just made." Later, defense counsel added that he believed he was allowed to ask if the witness was "given any consideration for that pending charge at all by cooperating with the State."

¶148. After the bench conference concluded and the objection was sustained, Lewis's cross-examination of McKnight continued forward into other matters. Ultimately, the cross-examination returned to the issue of consideration when defense counsel pointedly asked McKnight in the presence of the jury,

---

writing twelve (12) bad checks in 1997; and that she was previously addicted to crack cocaine, adequately impeaching the witness's character in front of the jury.

*Scott*, 796 So. 2d at 964 (¶17). Similarly, during McKnight's testimony in this case, it was revealed in front of the jury that he had engaged in selling drugs and also had a prior felony conviction for possession of drugs.

[Defense]:    Are you getting any consideration from the State for your testimony today?

[McKnight]:  No, sir.

[Defense]:    Nothing?

[McKnight]:  No.

¶149. Because the evidence in this case is more closely aligned with the facts and holdings in *Scott* and *Graves*, *Suan* is inapplicable here. The rule in *Suan* should not apply to Lewis's assignment of error because McKnight explicitly testified that he was not receiving any consideration from the State for his testimony against Lewis, and there is no evidence indicating that McKnight testified favorably in Lewis's case in exchange for favorable treatment from the State on an alleged pending indictment. Under *Scott* and *Graves*, cross-examination may be limited as to allegations of pending charges where the record lacks evidence supporting the line of questioning, and the record in the instant case is absent of any evidence whatsoever supporting the existence of a pending indictment against McKnight. Therefore, I find the lack of evidence in the record is determinative and would conclude that the trial court did not err when it limited Lewis's cross-examination of McKnight by precluding questions about an allegedly pending indictment.

**BARNES, C.J., AND LAWRENCE, J., JOIN THIS OPINION.**